ORDERED UNSEALED on 03/26/2026   s/ andreasar

Daniel McLaughlin (SBN: 315326)
   dmclaughlin@cja.org
Elzbieta T. Matthews (*pro hac vice pending*)
   ematthews@cja.org
Cole Newcomb (*SBN pending*)
   cnewcomb@cja.org
CENTER FOR JUSTICE AND
ACCONTABILITY
268 Bush St #3432
San Francisco, CA 94104
(415) 544-0444

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANSSAF ALI MAYO,<br><br>       Plaintiff,<br><br>   v.<br><br>ABRAHAM GOLAN,<br>ISAAC GILMORE, and<br>DALE COMSTOCK,<br><br>       Defendants. | Case No. '25CV3651 LL   AHG<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

1

## PRELIMINARY STATEMENT

1. This action arises out of the unlawful actions by Defendants Abraham Golan, Isaac Gilmore, and Dale Comstock (collectively, the "Defendants"), who were hired by the United Arab Emirates ("U.A.E.") to carry out targeted assassinations of perceived political opponents in Yemen starting in 2015.

2. In August 2015, Defendant Golan ("Golan") founded and incorporated Spear Operations Group LLC ("Spear"), a private military contractor corporation, in Delaware. Golan quickly set about recruiting former members of the U.S. military, including Defendant Gilmore ("Gilmore"), who joined as Spear's chief operating officer in October 2015.

3. At the time, both Golan and Gilmore resided in or near San Diego, California, which they used as a base for their operation.

4. Together, Golan and Gilmore pitched prospective foreign sovereign clients on an extraordinary service that went well beyond providing security or even military support: targeted extrajudicial killings.

5. Spear, through Golan and Gilmore, reached an agreement with the U.A.E. to carry out an assassination program targeting Yemeni leaders who opposed the U.A.E.'s interests in Yemen. In exchange, Spear would receive $1.5 million per month, with bonuses for successful assassinations.

6. The U.S. Department of State, which regulates private U.S. companies that provide military services to foreign nations, never granted Spear the authority to provide targeted assassination services to another country, nor has it ever granted any other U.S. corporation the authority to do so.

7. Yet, Golan has publicly acknowledged: "There was a targeted assassination program in Yemen. I was running it. We did it. It was sanctioned by the U.A.E. within the coalition."

8. Golan recruited Defendant Comstock ("Comstock") to join Spear in or around December 2015 by flying him to San Diego so the two could meet in person.

9. During the meeting, at Golan's San Diego home, Golan informed Comstock that Spear would be carrying out a targeted assassination program in Yemen on behalf of the U.A.E. Golan asked Comstock to serve as the head of the targeted assassination program. At the conclusion of the meeting, Golan put $40,000 on the table. Comstock took the money, accepted the position, and agreed to participate in the assassination program.

10. Defendants recruited approximately a dozen other individuals to Spear, including other former members of the U.S. military.

11. On December 14, 2015, Defendants and the Spear team met in person to discuss the targeted assassination program in Yemen. This meeting took place in the United States. At the meeting, each of the participants agreed to proceed with the targeted killings, including each of the Defendants (the "Spear Assassination Team").

12. On December 15, 2015, the Spear Assassination Team boarded a chartered plane from Teterboro Airport in New Jersey dressed in military tactical gear. They flew to the U.A.E. and then ultimately onto Aden in Yemen, where they arrived on or about December 16, 2015.

13. Upon arrival, the Spear Assassination Team received a kill list from a uniformed Emirati officer, which Gilmore described as "23 cards with 23 names and 23 faces."

14. At the top of the kill list was Plaintiff Anssaf Ali Mayo ("Plaintiff"), a civilian who was a member of Yemen's House of Representatives and the Chairman of the al-Islah party in Aden, Yemen's second-largest political party.

15. According to Defendants' own statements and drone surveillance footage of the event, on December 29, 2015, the Spear Assassination Team tracked Plaintiff to his political party's headquarters and attempted to assassinate him by detonating a powerful explosive device on the building's front door.

16. Plaintiff survived the assassination attempt, but was forced to flee the

country and has lived in exile since Defendants tried to kill him.

17.    The Spear Assassination Team continued its campaign of assassinations in Yemen at the behest of the U.A.E. and was, according to Golan, responsible for a number of high-profile assassinations that followed.

18.    In October 2018, public reporting by BuzzFeed News first detailed Defendants' targeted assassination program in Yemen. Golan and Gilmore were interviewed for the article and conceded their involvement in the campaign of killings in Yemen at the behest of the U.A.E., including Plaintiff's attempted assassination.[1]

19.    In January 2024, the BBC published a video documentary with additional reporting on Defendants' targeted assassination program in Yemen. The BBC documentary includes video interviews with Gilmore and Comstock, in which they both admitted their involvement in the campaign of killings in Yemen at the behest of the U.A.E., including Plaintiff's attempted assassination.[2]

20.    This is an action for compensatory and punitive damages for torts in violation of the Alien Tort Statute, 28 U.S.C. § 1350 and the California Code of Civil Procedure § 354.8.

**PARTIES**

21.    Plaintiff Anssaf Ali Mayo is a Yemeni citizen who resides in exile in Saudi Arabia. He has a bachelor's degree in accounting and has been a member of the Yemeni House of Representatives since April 27, 2003, representing Electoral

---

[1] Aram Roston, *A Middle East Monarchy Hired American Ex-Soldiers To Kill Its Political Enemies. This Could Be The Future Of War*, BuzzFeed News (Oct. 16, 2018), https://www.buzzfeednews.com/article/aramroston/mercenaries-assassination-us-yemen-uae-spear-golan-dahlan.

[2] BBC World Service, *American mercenaries hired by UAE to kill in Yemen - BBC World Service Documentaries*, YouTube (Jan. 23, 2024), https://www.youtube.com/watch?v=Z51MTI9sbFY.

4

District No. 20 in Aden. In 2015, at the time of Defendants' assassination attempt, Plaintiff was serving as the al-Islah party Chairman in Aden. In 2020, Plaintiff was elected to serve as Chairman of the Arab Parliament's Economic and Financial Affairs Committee. Plaintiff, as a representative of the al-Islah party, has taken part in the U.N. peace process for Yemen and has personally met with the United Nations Special Envoy to Yemen and the U.S. Ambassador to Yemen, including as recently as October 2025.

22.    Gilmore is a U.S. citizen and a resident of San Diego, California. Gilmore served as a non-commissioned officer in the U.S. Navy SEAL Team until his discharge in 2011. Gilmore joined Spear in October 2015 and served as its chief operating officer until April 2016.

23.    Golan is an Israeli-Hungarian citizen and a resident of Westport, Connecticut. Golan founded Spear in August 2015 and served as its chief executive officer. Before and at the time of the events alleged in this complaint, Golan was a resident of Rancho Santa Fe, in San Diego County, California where he owned at least two homes. He has also been associated with at least three other residences in California.

24.    Comstock is a U.S. citizen and resident of Indonesia. Comstock was previously a member of the U.S. Army Special Forces. After retiring from military service, Comstock worked as a contractor for the U.S. government between 2001 and 2011. Comstock joined Spear in 2015 and served as the head of operations for its targeted assassination program.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over Plaintiff's claim for war crimes as a tort in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350.

26.    This Court has subject matter jurisdiction over Plaintiff's claim for attempted extrajudicial killing as a tort in violation of the law of nations under the

5

Alien Tort Statute, 28 U.S.C. § 1350.

27. This Court has subject matter jurisdiction over Plaintiff's claim for crimes against humanity as a tort in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350.

28. This Court has supplemental jurisdiction over Plaintiff's California state law tort claims under supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

29. This Court has personal jurisdiction over Gilmore because, on information and belief, Gilmore is a resident of San Diego County, California.

30. This Court has personal jurisdiction over Golan because, on information and belief, Golan was a resident of San Diego County, California at the time of the incidents giving rise to Plaintiff's claims, a substantial part of his actions giving rise to the claim occurred in California, and exercising jurisdiction is consistent with the Constitution and United States law.

31. This Court has personal jurisdiction over Comstock pursuant to Fed. R. Civ. P. 4(k)(2) because the claims arise under federal law, Comstock is not subject to jurisdiction in any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the Constitution and United States law.

32. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Alternatively, if venue is not proper in this District pursuant to 28 U.S.C. § 1391(b)(1) or 28 U.S.C. § 1391(b)(2), venue is proper under 28 U.S.C. § 1391(b)(3) as all Defendants are subject to the Court's personal jurisdiction with respect to this civil action.

**STATEMENT OF FACTS**

**A. Historical Context: The Conflict in Yemen and the U.A.E.'s Intervention.**

33.    Yemen is in the southwest of the Arabian Peninsula, bordering Saudi Arabia in the north, Oman in the east, the Red Sea to the west, and the Gulf of Aden and Arabian Sea to the south. Since 2014, Yemen has been entangled in a civil war involving foreign proxies. Following a series of uprisings in 2012, the then-president of Yemen, Ali Abdullah Saleh, resigned in favor of Abd Rabbu Mansur Hadi, a U.S.-backed candidate. In opposition, the Houthis, an Iran-backed Shia movement, seized Yemen's capital in 2014 and advanced on the port of Aden prompting a civil conflict. Regional forces intervened in March 2015 as part of a military coalition against the Houthis to restore the Hadi government. The military coalition included the United Arab Emirates (U.A.E.) and the U.S. The coalition's intervention in Yemen consisted of airstrikes, a naval blockade, and ground offensive, including The Battle of Aden, a nearly four-month long offensive in which coalition ground forces supported Hadi loyalists to retake Aden from the Houthis.

34.    The United Nations has declared the war in Yemen to be a non-international armed conflict since its inception in September 2014, and the member states of the military coalition to be co-belligerents.

35.    The U.A.E.'s intervention in Yemen can be attributed to three primary interests.

36.    First, given Iran's support for the Houthis, the U.A.E. sought to prevent Iran from expanding its influence into Yemen.

37.    Second, the port of Aden was critical to the U.A.E.'s maritime trading ambitions. The U.A.E. has become a focal point for international trade linking East Africa and South Asia. Yemen is strategically located along the Gulf of Aden, at the intersection of the Arabian and Red Seas. Controlling the Gulf of Aden would expand the U.A.E.'s shipping capacity through the Red Sea and would allow the

7

U.A.E. to bypass the Strait of Hormuz, which Iran has frequently threatened to shut down.

38.    Finally, the U.A.E. wanted to extinguish al-Islah, a Yemeni political party which the U.A.E. views as opposing its interests in Yemen. Al-Islah was founded in 1990 after the reunification of the north and south of Yemen. It is an internationally recognized political party and its members have held numerous seats in Parliament. Its leadership has met with the U.S. Ambassador to Yemen, and with diplomats from France, Britain, Germany, and the European Union. Plaintiff, as a representative of the al-Islah party has personally met with the United Nations Special Envoy to Yemen and the U.S. Ambassador to Yemen, including as recently as October 2025.

39.    While coalition members, including the U.S., forged an alliance with al-Islah to defeat the Houthis, the U.A.E. made the weakening of al-Islah one of its primary goals in the conflict.

**B. The U.A.E.'s Persecution of Perceived Political Opponents in Yemen.**

40.    The U.A.E. is an authoritarian monarchy that persecutes perceived political opposition both in and out of its territory.

41.    Political parties are banned in the U.A.E. where the 1980 Publications and Publishing Law regulates the media and prohibits any form of political criticism. According to Human Rights Watch, "U.A.E. authorities have launched a sustained assault on freedom of expression and association since 2011. The U.A.E. arbitrarily detains and forcibly disappears individuals who criticize the authorities within the U.A.E.'s borders." It has detained hundreds of activists, civil society leaders, and academics for offenses related to political dissent.

42.    The U.A.E.'s persecution of perceived political dissidents extends beyond its borders and into Yemen.

43.    Starting in 2015, as part of its intervention in the Yemeni civil war, and to this day, the U.A.E. uses paramilitary affiliates in Yemen, the Hadrami Elite Forces

8

and Security Belt Forces, to threaten and kidnap perceived opposition, particularly al-Islah members, under the guise of "counterterrorism".

44. When the Spear targeted assassination program began in late 2015, the U.A.E. appeared to have effectively decided that the focus of its intervention in the Yemeni civil war would be gaining control of the Port of Aden and a quiet campaign against al-Islah. This campaign involved kidnapping and threatening al-Islah supporters and assassinating al-Islah party members.

45. The U.S. Department of State's 2017 human rights report on Yemen states: "Local NGOs and media also reported that individuals tied with al-Islah have been arbitrarily detained in Mukalla by U.A.E.-affiliated Security Belt forces."

46. Amnesty International further concludes: "Critics of the coalition and the practices of U.A.E.-backed security forces have been among those rounded up [by the Security Belt and Elite Forces], including community figures, activists and journalists, as well as sympathizers and members of the al-Islah Party." Freedom House affirmed that U.A.E. associated forces "have used arbitrary arrests, detentions, and enforced disappearances to persecute" groups including members of al-Islah in Yemen.

47. In 2019, the UN Group of Eminent International and Regional Experts on Yemen (the "UN Group of Experts") found that from 2017 to May 2018, "there were a series of detentions, threats, assaults and obstructions of journalists, human rights activists, and newspapers who had been critical of the United Arab Emirates, Southern Transitional Council or Security Belt, or were perceived as being pro-al-Islah." The UN Group of Experts further states that it "found reasonable grounds to believe that the United Arab Emirates are responsible for the 10 assassinations [in Aden] it investigated, which amount to the human rights law violation of arbitrary deprivation of life."

48. The U.A.E. used its paramilitary forces in Yemen to threaten and detain al-Islah supporters, and Spear provided a key component of its campaign to silence

9

their opponents in Aden–the targeted assassinations of al-Islah leadership, including Plaintiff.

**C. Defendants' Targeted Assassination Program in Yemen.**

　　*a. Defendants Recruited, Planned, and Jointly Agreed to Carry Out Their Targeted Assassination Program From the United States.*

49.　Golan founded and incorporated Spear, a private security contractor company, in Delaware in August 2015.

50.　Following Spear's founding, Golan recruited Gilmore, a U.S. citizen and resident and a former member of the U.S. military, who joined Spear as its chief operating officer in October 2015.

51.　Prior to joining Spear, Gilmore had been decommissioned from the U.S. military in 2011 for accidently shooting a Navy SEAL during a training exercise. Gilmore has stated that he chose to join Spear because the accident had stained his military career and that he was considered an outsider, unable to find more traditional opportunities for former members of the military. When he joined Spear, his last significant employment had been as an executive at an artisanal tequila company.

52.　In or about October 2015, Golan and Gilmore pitched and ultimately reached an agreement with the U.A.E. that Spear would carry out a campaign of targeted assassinations in Yemen on the U.A.E.'s behalf. In exchange, Spear would be paid $1.5 million per month plus bonuses for successful assassinations.

53.　On information and belief, while in the United States, Golan and Gilmore repeatedly reached out to U.S.-based individuals to recruit them to join Spear.

54.　Golan and Gilmore specifically recruited other former members of the U.S. military, whose U.S. military training and experience were key selling points in their pitch to prospective sovereign clients, including the U.A.E.

55.　Many of the former members of the U.S. military recruited by Golan and Gilmore declined to join Spear given the nature of the services being offered.

56.    The former U.S. military personnel who ultimately chose to join Spear in December 2015 did so at rates of upwards of $20,000 per month plus bonuses, well above the market rate they would have received for typical private security work abroad.

57.    As part of his efforts to recruit Comstock to join Spear, Golan flew Comstock to San Diego, California so the two could meet in person.

58.    During the meeting, at Golan's San Diego home, Golan informed Comstock that Spear would be carrying out a targeted assassination program in Yemen on behalf of the U.A.E. Golan asked Comstock to serve as the head of the targeted assassination program. At the conclusion of the meeting, Golan put $40,000 on the table. Comstock took the money, accepted the position, and agreed to participate in the assassination program.

59.    Going forward, Spear paid Comstock an additional $40,000 per month plus bonuses to run the targeted assassination program.

60.    On December 14, 2015, the Defendants gathered in person with the rest of the Spear Assassination Team, approximately a dozen total members, near Teterboro Airport in New Jersey. There, Golan, detailed the targeted assassination program they would be carrying out in Yemen. Each of the participants was told that, if they were no longer interested, they could keep the $20,000 advance payment they had already received and leave with no questions asked. None of the participants quit. They all agreed to proceed with the targeted killings in Yemen, including each of the Defendants.

61.    Following their agreement to proceed, the Spear Assassination Team packed military equipment, including body armor, communications gear, and specialized tools to prepare blasting caps on explosives, which they brought with them to Yemen.

62.    On information and belief, this same equipment was used in carrying out assassinations in Yemen, including Plaintiff's assassination attempt on December

11

29, 2015.

63. Following their arrival in Yemen, Golan and Gilmore continued to recruit former members of the U.S. military based in the U.S., a number of whom later traveled to Yemen and integrated into the Spear Assassination Team.

64. On information and belief, the U.A.E. transferred funds to Spear and Golan's U.S. bank accounts for the work of the Spear Assassination Team in Yemen.

65. On information and belief, Spear and Golan transferred funds from their U.S. bank accounts to the U.S. bank accounts of members of the Spear Assassination Team for the killings carried out in Yemen.

66. At all relevant times, Spear continued to enter into contracts with U.S.-based individuals and businesses to support its work on behalf of the U.A.E.

67. For example, on March 8, 2016, Spear entered into a service contract with Fadi Elsalameen, a U.S. citizen. The service contract, which states that its provisions are governed by U.S. law, provides that Elsalameen would assist in expanding Spear and Golan's current business with the U.A.E. In exchange, Spear agreed to pay Elsalameen a monthly retainer of $20,000, a $50,000 signing bonus, and twenty percent of all revenue that Spear collected from the U.A.E. Golan served as a personal guarantor to the service agreement.

68. Defendants' agreement to carry out and their implementation of the targeted assassinations in Yemen violate U.S. federal criminal statutes, namely the War Crimes Act (18 U.S.C. § 2441) and Conspiracy to Kill, Kidnap, Maim, or Injure Persons or Damage Property in a Foreign Country (18 U.S.C. § 956).[3]

---

[3] Ryan Goodman & Sarah Knuckey, *Justice Department Must Open Criminal Investigation Into Potential War Crimes by U.S. Mercenaries in Yemen*, Just Security (Oct. 16, 2018), https://www.justsecurity.org/61091/u-s-justice-department-open-criminal-investigation-potential-war-crimes-u-s-mercenaries-yemen/.

12

69.    Further, under the Arms Control Export Act (AECA) and the International Traffic in Arms Regulations (ITAR), a U.S. contractor must seek licensure by the State Department for the export of military services. There is no indication that Defendants sought such approval, let alone that it was granted.

### b. Once in Yemen, Defendants Carried out their Targeted Assassination Program on Behalf of the U.A.E.

70.    Following the Spear Assassination Team's arrival in Yemen on December 16, 2015, Defendants were principally based in Yemen until at least late March 2016.

71.    Golan has stated that he was told that the goal of Spear's work in Yemen was to disrupt and destroy the al-Islah political party.

72.    Upon arrival, U.A.E. officials gave the Spear Assassination Team an initial kill list, featuring "23 cards, with 23 names and 23 pictures" of targets in Yemen.

73.    Each card contained only rudimentary intelligence about the target listed. Gilmore has conceded that the Spear Assassination Team did not question the information provided by U.A.E. officials and that some of the targets may have been people who merely fell out of favor with the U.A.E.'s ruling family.

74.    Golan and Gilmore, the two Spear corporate officers, also received official designations within the Emirati Armed Forces. Golan was named a colonel and Gilmore a lieutenant colonel.

75.    Gilmore and Golan requested that they be incorporated into the U.A.E. Armed Forces under the erroneous belief that doing so would shield them from legal liability for their otherwise unlawful actions.

76.    Once in Yemen, the Spear Assassination Team undertook its campaign of assassinations and was, according to Golan and Comstock, responsible for several high-profile assassinations in Yemen.

13

77. After the Spear Assassination Team began operating in Yemen, there was a surge in the assassination of Yemeni civilians who were perceived to be opposed to the U.A.E.'s interests. One member of the UN Group of Experts estimated that, as 2016 progressed, members of the al-Islah party were "dying at an alarming rate".

78. Upon information and belief, the Spear Assassination Team continued to operate in Yemen after late March 2016 and received additional kill lists targets from U.A.E. officials.

79. The Spear Assassination Team also trained individuals based locally, including Yemeni men from U.A.E.-controlled detention and torture centers, to carry out assassinations to further aid the U.A.E. in its targeting of perceived political opponents in Yemen.

**D. The Attempt to Kill Plaintiff (December 29, 2015).**

80. Each Defendant has admitted that they participated in the assassination attempt on Plaintiff in Yemen.

81. Golan and Gilmore have stated that Plaintiff, who served as the al-Islah party Chairman in Aden, was at the top of the deck of targets they received from the U.A.E. They both acknowledged that they participated in and were present during his assassination attempt.

82. Comstock admitted to planning the attack on Plaintiff and stated that he participated in and was present during the assassination attempt.

83. On December 29, 2015, after having tracked Plaintiff's daily movements, the Defendants agreed to a plan to assassinate Plaintiff by setting off explosives at the al-Islah political party headquarters, located near a soccer stadium in Aden. The explosion was intended to kill everybody in the party headquarters, including Plaintiff. The Spear Assassination Team, including Defendants, then planned to finish off any survivors through small arms fire.

84. On the evening of December 29, 2015, the Spear Assassination Team, including Defendants, received surveillance information from an informant and

from infrared drone footage that Plaintiff was present at the al-Islah political party headquarters. They set out from their base of operations in two armored SUVs to carry out Plaintiff's targeted assassination. They were accompanied by an Emirati soldier who served as a driver for one of the SUVs.

85. When they arrived at the al-Islah headquarters, the Spear Assassination Team crept out of their SUV, firearms at the ready and carrying an explosive charge loaded with shrapnel. According to Defendants' own accounts and drone footage of the assassination attempt, Comstock placed the explosive charge on the door of the al-Islah political party headquarters and detonated the charge, creating a massive explosion that destroyed portions of the building. Members of the Spear Assassination Team also opened fire in and around the al-Islah political party headquarters.

86. While the Spear Assassination Team specifically targeted Plaintiff, they carried out the assassination attempt without regard to whether any other civilians would also be harmed. As stated by Comstock, who built, placed, and detonated the powerful explosive device used in Plaintiff's assassination attempt: "I was gonna try to open the door, throw a couple hand grenades in there, and then just go in there and shoot everybody."

87. On information and belief, at the time, the Spear Assassination Team believed it had successfully carried out Plaintiff's assassination as planned.

88. Following the assassination attempt, the Spear Assassination Team withdrew from the area, after booby-trapping one of their SUVs to cover their tracks and add to the destruction near the al-Islah political party headquarters.

89. Unbeknownst to Defendants however, Plaintiff had been informed that his life was in danger and had fled the al-Islah political party headquarters minutes before the assassination attempt.

90. Plaintiff suffered psychological and emotional trauma knowing that Defendants were en route to assassinate him and then attempted to do so.

15

91. Plaintiff was forced to leave Yemen given the attempt on his life. On January 1, 2016, just three days after the attack, Plaintiff fled to Saudi Arabia, where he remains in exile.

92. Since 2016, Plaintiff lives separated from his wife and children, who continue to reside in Yemen. For the past decade, Plaintiff sees his family in person only once a year on average, often in a third country to which they can all travel.

93. Plaintiff's ability to carry out his work as a member of al-Islah's political leadership was also impacted by the attempt on his life. Plaintiff has been unable to return to Yemen other than on a handful of occasions, and only with special security measures in place.

94. Following Plaintiff's attempted assassination, Defendants continued to carry out targeted assassinations in Yemen with impunity.

95. Local Yemeni authorities opened an investigation into Plaintiff's assassination attempt. Following the assassination attempt, the local criminal investigation unit and police arrived after the explosion, took witness statements, and inspected what was left of the Spear Assassination Team's vehicle. Plaintiff also contacted the local security forces and the Minister of the Interior to ask them to investigate the incident. However, there was little progress in these investigations.

96. Yemen submitted a complaint to the Inter-Parliamentary Union, an international organization of national parliaments, on Plaintiff's behalf. Nothing came of this complaint.

97. In 2018, when the BuzzFeed News article was published identifying that Spear and Defendants Golan and Gilmore had conducted the attempted assassination on behalf of the U.A.E., the investigations became too politically sensitive and dangerous to continue in Yemen. Plaintiff asked the Yemeni Parliament to issue a statement requesting an investigation into the targeted killings in Aden. Because of the sensitivities regarding U.A.E. involvement, no parliamentarians were willing to participate.

16

98.    To date, the Yemeni investigation into Plaintiff's assassination attempt has not progressed, nor have there been any prosecutions or convictions. Similarly, all attempts to seek justice in national courts by families of victims in similar incidents in Aden have been unsuccessful. Even if the cases are still pending years later, they are at a standstill and have not progressed past the preliminary stages.

99.    The Yemeni judicial system is ill-equipped to handle these types of complex investigations and prosecution, particularly where, as here, they involve targeted assassinations carried out by foreigners, all of whom have since left Yemen and its jurisdiction.

100.    Defendants left Yemen following the targeted assassinations campaign they carried out on behalf of the U.A.E., including the attempt on Plaintiff's life.

**FIRST CLAIM FOR RELIEF**

**ATTEMPTED MURDER AS A WAR CRIME**

**UNDER THE ALIEN TORT STATUTE (28 U.S.C. § 1350)**

**(All Defendants)**

101.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

102.    The acts alleged herein constitute attempted murder as a war crime, a "tort . . . committed in violation of the laws of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350. Attempted murder violates customary international law prohibiting war crimes as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, including the War Crimes Act (18 U.S.C. § 2441).

103.    Since 2014, Yemen has been engaged in a non-international armed conflict. Defendants' attempt to kill Plaintiff was committed in the context of, and associated with, a non-international armed conflict as described in paragraphs 33-34.

104.    Defendants were aware of the factual circumstances that established the existence of a non-international armed conflict, in part because they were

combatants in the armed conflict in Yemen.

105.   Defendants attempted to murder Plaintiff on behalf of the U.A.E. in violation of the laws governing non-international armed conflicts, including the prohibition against murdering civilians.

106.   At all relevant times described herein, Plaintiff was a civilian taking no active part in hostilities and therefore protected under the laws governing non-international armed conflict. Defendants knew that Plaintiff was a civilian.

107.   Defendants also conspired with the other members of the Spear Assassination Team to murder Plaintiff on behalf of the U.A.E. An actual or tacit agreement existed between Defendants and other members of the Spear Assassination Team to murder Plaintiff.

108.   Further, in targeting Plaintiff, Defendants aided and abetted the other members of the Spear Assassination Team who knew of, and/or otherwise intended to participate in Plaintiff's attempted assassination on behalf of the U.A.E.

109.   Defendants' acts and omissions directly and proximately caused Plaintiff to suffer severe and ongoing mental pain and suffering.

110.   Plaintiff has suffered damages in an amount to be determined at trial as a result of the attempted murder as a war crime.

111.   Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

## ATTEMPTED EXTRAJUDICIAL KILLING

## UNDER THE ALIEN TORT STATUTE (28 U.S.C. § 1350)

### (All Defendants)

112.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

113.   The acts committed against Plaintiff by Defendants during their attack on December 29, 2015 constitute an attempted extrajudicial killing, a "tort . . .

18

committed in violation of the laws of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350. Attempted extrajudicial killing violates customary international law as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

114. Defendants attempted to extrajudicially kill Plaintiff on behalf of the U.A.E.

115. Defendants also conspired with the other members of the Spear Assassination Team to extrajudicially kill Plaintiff on behalf of the U.A.E. An actual or tacit agreement existed between Defendants and the other members of the Spear Assassination Team to attempt to extrajudicially kill Plaintiff.

116. Further, in targeting Plaintiff, Defendants aided and abetted the other members of the Spear Assassination Team who knew of, and/or otherwise intended to participate in Plaintiff's attempted extrajudicial killing on behalf of the U.A.E.

117. Defendants' acts and omissions directly and proximately caused Plaintiff to suffer severe and ongoing mental pain and suffering.

118. Plaintiff has suffered damages in an amount to be determined at trial as a result of the attempt to extrajudicially kill him.

119. Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

**PERSECUTION AS A CRIME AGAINST HUMANITY**

**UNDER THE ALIEN TORT STATUTE (28 U.S.C. § 1350)**

**(All Defendants)**

120. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

121. The acts alleged herein constitute the crime against humanity of persecution on discriminatory grounds, a "tort . . . committed in violation of the laws

of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350. Persecution as a crime against humanity violates customary international law prohibiting crimes against humanity as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

122.   Since at least 2015, the U.A.E. has engaged in a widespread or systematic attack directed against a civilian population, namely perceived political opponents in Yemen, including members of the al-Islah political party as described in paragraphs 38-48.

123.   Defendants knew of and participated in the U.A.E.'s widespread or systematic attack against the civilian population in Yemen.

124.   As part of this widespread or systematic attack, Defendants targeted Plaintiff on behalf of the U.A.E. because of Plaintiff's political affiliation, as the al-Islah party Chairman in Aden.

125.   Defendants conspired with U.A.E. officials to persecute Plaintiff. An actual or tacit agreement existed between Defendants, U.A.E. officials, and the other members of the Spear Assassination Team to target perceived political opponents in Yemen, including members of the al-Islah party. Defendants developed and implemented a targeted assassination campaign in Yemen to facilitate the U.A.E.'s persecution of these perceived political opponents, including Plaintiff.

126.   In targeting Plaintiff, the U.A.E. was aided and abetted by Defendants who knew of, and/or otherwise intended to participate in, the widespread or systematic attack committed by the U.A.E. against perceived political opponents in Yemen, including the targeted assassination of Plaintiff.

127.   The acts and omissions of Defendants directly and proximately caused Plaintiff to suffer severe and ongoing mental pain and suffering.

128.   Plaintiff has suffered damages in an amount to be determined at trial as a result of his persecution as a crime against humanity.

129.   The acts and omissions of Defendants were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

## ASSAULT AND BATTERY

## UNDER CALIFORNIA CODE OF CIVIL PROCEDURE (§ 354.8)

### (All Defendants)

130.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

131.   The acts committed against Plaintiff by Defendants during the assassination attempt on December 29, 2015 constitute an assault and battery pursuant to California Code of Civil Procedure § 354.8 given that the conduct constitutes:

  i)   A war crime, as defined in Section 2441 of Title 18 of the United States Code;

  ii)   An attempted extrajudicial killing, as defined in Section 3(a) of Public Law 102-256; and/or

  iii) Persecution as a crime against humanity.

132.   Defendants' acts directly and proximately caused Plaintiff to suffer severe and ongoing mental pain and suffering.

133.   Plaintiff is entitled to damages in amounts to be determined at trial as a result of the assassination attempt described herein.

134.   Defendants' acts were deliberate, willful, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

To the extent permitted by law, Plaintiff seeks the following relief against Defendants:

    (a)    Compensatory damages;

    (b)    Punitive damages;

    (c)    Injunctive relief, including an order that Defendants cease taking any actions relating to targeting Plaintiff for assassination or other harms;

    (d)    Reasonable attorneys' fees, costs and expenses; and,

    (e)    Such other and further relief as the Court may deem just and proper.

Plaintiff requests a trial by jury for each claim for relief and all triable issues.

Dated: December 18, 2025        By:

/s/ Daniel McLaughlin

Daniel McLaughlin (SBN: 315326)
dmclaughlin@cja.org
Elzbieta T. Matthews (*pro hac vice pending*)
ematthews@cja.org
Cole Newcomb (*SBN pending*)
cnewcomb@cja.org
CENTER FOR JUSTICE
AND ACCOUNTABILITY
268 Bush Street #3432
San Francisco, CA 94104
Tel: (415) 544-0444

*Attorneys for Plaintiff*

22